# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DARL SHOOK,                                     Case No. 1:10-cv-860

     Plaintiff                                 Dlott, J.
                                                Litkovitz, M.J.

     vs

MICHAEL J. ASTRUE,                              **REPORT AND**
COMMISSIONER OF                                 **RECOMMENDATION**
SOCIAL SECURITY,

     Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's

application for disability insurance benefits ("DIB"). This matter is before the Court on

plaintiff's Statement of Specific Errors (Doc. 10), the Commissioner's Memorandum in

Opposition. (Doc. 15) and plaintiff's Reply. (Doc. 16).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1959 and was 50 years old at the time of the decision of the

administrative law judge ("ALJ"). Plaintiff obtained a GED and has past relevant work

experience as a kitchen helper, lawn mower operator, forklift operator, and maintenance worker.

Plaintiff filed a DIB application on August 8, 2007, alleging a disability onset date of

July 1, 2005 due to depression, spine spurs and nerve damage. (Tr. 148-52). The application

was denied initially and upon reconsideration. (Tr. 67-68, 74-76). Plaintiff then requested and

was granted a *de novo* hearing before an ALJ. (Tr. 77-79). On February 2, 2010, plaintiff,

represented by counsel, appeared and testified at a hearing before ALJ Deborah Smith.  (Tr. 29-60).  Also, a vocational expert ("VE"), Donald Shrey, Ph.D., appeared and testified.  (Tr. 60-66).

On March 11, 2010, the ALJ issued a decision denying plaintiff's DIB application. (Tr. 15-24).  The ALJ found that plaintiff last met the insured status requirements for DIB on December 31, 2009.  (Tr. 17).  The ALJ determined that, through the date last insured, plaintiff suffered from the following severe impairments: intermittent explosive disorder, post-traumatic stress disorder, anti-social personality disorder, psychotic disorder, and drug abuse.  *Id.*  The ALJ further determined that plaintiff had the following non-severe impairments: recurrent nausea and vomiting, gastroesophageal reflux disease, esophagitis, hiatal hernia, chronic gastritis, status-post cholecystectomy, history of chronic cholecystitis, history of cholelithiasis, history of peptic ulcer disease, hepatitis C, carpal tunnel syndrome, right ulnar nerve lesions, and neck pain.  *Id.*  The ALJ found that these impairments, considered singly and in combination, did not meet or equal the level of severity described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18).

The ALJ further determined that plaintiff was capable of performing a full range of work at all exertional levels but with the following nonexertional limitations:

> [Plaintiff] could process moderately complex interactions.  His concentration and attention were adequate for routine tasks.  He could exercise fairly good judgment and adapt to change.  There was no record of decompensation under stress.  He could do best with activities which minimized social exposure.  He should avoid contact with the general public.  He should not do work that involves more than minimal/superficial contact with co-workers.  He should avoid work requiring strict production quotas.

(Tr. 18).

2

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with above RFC. (Tr. 19). The ALJ further determined that through the date last insured, plaintiff could perform his past relevant work as a kitchen helper, lawn mower operator, forklift operator, and maintenance worker. (Tr. 23). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to disability benefits. (Tr. 24).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

3

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423(a). Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations which is the same for purposes of both DIB and SSI benefits. See 20 C.F.R. §§ 404.1520, 416.920; *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the

4

individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Sec'y of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Sec'y of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Sec'y of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by

substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs."
*Richardson*, 735 F.2d at 964 (emphasis in original); *O'Banner,* 587 F.2d at 323. Taking notice
of job availability and requirements is disfavored. *Kirk*, 667 F.2d at 536-37 n.7, 540 n.9. There
must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific
jobs in the national economy. *Richardson,* 735 F.2d at 964; *Kirk,* 667 F.2d at 536-37 n.7. The
Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity
for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only
through specific proof of plaintiff's individual capacity, as well as proof of the requirements of
the relevant jobs. *Phillips* v. *Harris,* 488 F. Supp. 1161 (W.D. Va. 1980) (citing *Taylor v.
Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a
vocational expert is required to show the availability of jobs that plaintiff can perform. *Born,*
923 F.2d at 1174; *Varley* v. *Sec'y of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42
U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment
does not establish entitlement to disability benefits. In order for a claimant to recover benefits,
the alleged mental impairment must be established by medical evidence consisting of clinical
signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404,
Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical
impairments. Once the Commissioner determines that a mental impairment exists, he/she must
then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R.

6

§§ 404.1520a and 416.920a. A standard review technique is completed at each level of administrative review for mental impairments. *Id*.

This special procedure requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R. § 404.1520a(c)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993) (per curiam). The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: none, mild, moderate, marked, and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. The Listings for mental disorders, with the exception of Listings 12.05 (mental retardation and autism) and 12.09 (substance addiction disorders), contain two parts, referred to as the Part A criteria and the Part B criteria. The Part A criteria consists of clinical findings which medically substantiate the presence of a mental disorder. One or more of the Part A criteria must be met. The Part B criteria consist of a list of functional restrictions which are associated with mental disorders and are incompatible with the

7

ability to work.  Two or three of the Part B criteria must be met.  Listings 12.03 and 12.06 also

contain a third element, the Part C criteria, which consist of additional functional considerations.

In order to qualify under the Listings for mental disorders, the functional restrictions described in

the Parts B and C criteria must be the result of the mental disorder demonstrated by the clinical

findings of Part A.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A).  Listing 12.09 for

substance abuse disorders is structured differently.  It is essentially a reference listing in that it

indicates certain other Listings that are to be used in evaluating the behavioral and physical

changes that may result from the regular use of addictive substances. *Id.*

  If a mental impairment does not meet or equal a listed mental disorder, the Commissioner

must then assess plaintiff's mental residual functional capacity.  The Commissioner must

determine if this mental residual functional capacity is compatible with the performance of the

individual's past relevant work, and if not, whether other jobs exist in significant numbers in the

economy that are compatible with this assessment.  *See* 20 C.F.R. §§ 404.1520(e)-(f),

404.1520a(c).

  "In general, the opinions of treating physicians are accorded greater weight than those of

physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

529-30 (6th Cir. 1997).  Likewise, a treating physician's opinion is entitled to weight

substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983).  The

weight given a treating physician's opinion on the nature and severity of impairments depends on

whether it is supported by sufficient medical data and is consistent with other evidence in the

record. 20 C.F.R. § 404.1527(d); *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

"A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" 20 C.F.R. § 404.1502. A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.' *Id.*" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

9

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

## MEDICAL RECORD

The record contains documentation of plaintiff's numerous hospital visits for physical complaints from 2000 to 2009. The record further contains plaintiff's treatment history for psychological impairments, including records from his treatment at Transitional Living from July 2007 to August 2009 and several psychological assessments. For the sake of clarity, the records pertaining to plaintiff's physical impairments will be discussed separately from those related to his psychological impairments.

10

I.      **Records related to plaintiff's physical impairments.**

In March 2000, plaintiff went to Mercy Hospital for complaints of nausea and vomiting.

A gallbladder ultrasound showed possible stones or polyps, but plaintiff checked out prior to

receiving a surgical consult. (Tr. 429).  In September 2003, plaintiff was treated at Fort

Hamilton Hospital for complaints of nausea, vomiting, and diarrhea. (Tr. 447).  Plaintiff was

treated with fluids and released with a prescription for antibiotics. (Tr. 448).

On September 25, 2004, plaintiff went to Mercy Hospital for complaints of nausea and

vomiting. (Tr. 526).  Plaintiff was observed for several hours and discharged after reacting

positively to nausea medication and apple juice and given prescriptions for Vicodin for pain and

Phenergen for nausea. (Tr. 527).  Two days later, plaintiff returned to Mercy Hospital for

complaints of abdominal pain and vomiting. (Tr. 521).  Plaintiff was given Pepcid, Phenergen

and Dilaudid intravenously and reported near-complete pain relief. (Tr. 522).  Plaintiff was

discharged with directions to follow a liquid diet, continue Phenergen for nausea, and follow up

for an esophagogastroduodenscopy (EGD) within 48 hours. (Tr. 522).

However, plaintiff returned to Mercy Hospital prior to his scheduled EGD for complaints

of nausea and vomiting and he reported having run out of anti-nausea medication. (Tr. 512).

Plaintiff underwent the scheduled EGD which evidenced minimal diffuse ulcer disease, antral

erosions and duodenal ulcers. (Tr. 513).  Upon discharge, plaintiff was given more medication

and advised to follow up. (Tr. 513-14).

Plaintiff returned to Mercy Hospital on January 12, 2005 for complaints of epigastric

pain, nausea and vomiting, which was successfully treated with intravenous medication and

11

plaintiff was given Prevacid and directed to take Pepcid and Maalox as needed.  (Tr. 321-23).

On January 18 2005, plaintiff underwent an electromyography for complaints of pain and

numbness in his right arms and right shoulder pain.  (Tr. 318).  Plaintiff was diagnosed with

ulnar nerve lesions at his right elbow and wrist.  (Tr. 319).  In February 2005, plaintiff was

treated at Mercy Hospital for complaints of neck pain and was diagnosed with degenerative disc

space narrowing. (Tr. 311)

On April 12 and 13, 2005, plaintiff was treated at again Mercy Hospital for complaints of

abdominal pain, nausea and vomiting and was diagnosed with possible gallbladder disease.  (Tr.

282, 301-08).  An ultrasound of his gallbladder demonstrated several polyps and plaintiff was

discharged with a prescription of Vicodin.  (Tr. 282).  On April 29, 2005, plaintiff underwent

surgery at Mercy Hospital and his gall bladder was removed and several stones were found in the

removed tissue.  (Tr. 275-77).

On May 14, 2006, plaintiff returned to Mercy Hospital for complaints of abdominal pain,

diarrhea, and dehydration.  (Tr. 238).  He was diagnosed with gastroenteritis, dehydration,

paralytic ileus and was treated with intravenous fluids and antibiotics and given Darvocet for

pain. *Id*.  The record indicates that plaintiff had prior substance abuse.  (Tr. 243).

On June 19, 2006, plaintiff was again treated at Mercy Hospital for complaints of

vomiting.  (Tr. 267).  Plaintiff was given medication for nausea, which he refused, and Ativan

for anxiety.  (Tr. 268).  On July 22, 2006, plaintiff returned to Mercy Hospital for complaints of

nausea and vomiting.  (Tr. 257).  Plaintiff reported an increase in anxiety and requested

medication for his nerves.  (Tr. 258).  Plaintiff was given a short prescription for Xanax.  (Tr. 261).

In April 19, 2007, plaintiff was admitted to Mercy Hospital for several days due to persistent nausea and vomiting.  (Tr. 332).  Plaintiff was rehydrated with intravenous saline and antibiotics for a suspected urinary tract infection.  (Tr. 334).  An EGD was performed and plaintiff was diagnosed with esophagitis and gastroesophageal reflux disease.  (Tr. 336).  An x-ray was performed at Fort Hamilton Hughes Professional Radiology which evidenced nonspecific, nonobstructive intestinal gas pattern.  (Tr. 353).

On May 23, 2007, Ashok Kejriwal, M.D., performed a physical and found that plaintiff did not have any significant limitations, but noted that he was limited to lifting/carrying 11 to 20 pounds on a frequent or occasional basis.  (Tr. 350).  Dr. Kejriwal found no other physical limitations.  *Id.*

Erich W. Ringel, M.D., performed a physical on June 1, 2007 and found that plaintiff was moderately limited in his abilities to push/pull and bend and was not significantly limited in his other physical abilities.  (Tr. 348).  Dr. Ringel opined that plaintiff was further limited to walking/standing for four hours in an eight hour work day, two to three hours without interruption, and could lift/carry only six to ten pounds frequently, eleven to twenty pounds occasionally.  *Id.*

On June 20, 2007, plaintiff was x-rayed at Fort Hamilton due to complaints of ongoing pain and vomiting.  (Tr. 352).  The radiologist diagnosed unremarkable, nonspecific nonobstructive bowel gas pattern.  *Id.*  Plaintiff was treated and released after tolerating solid

13

food. (Tr. 354). Psychiatric notes include that plaintiff had a strange affect but good eye contact and appeared to have a normal tone. (Tr. 356).

On September 26, 2007, plaintiff underwent a consultative examination by Phillip Swedberg, M.D. (Tr. 360-62). Dr. Swedberg found that plaintiff ambulated with a normal gait, was comfortable both standing and sitting, had good memory and ability to relate, and had reasonably intact appearance and orientation. (Tr. 360-61). Dr. Swedberg noted that plaintiff's level of intellectual functioning was slightly below normal. (Tr. 361). Plaintiff's muscle and grasp strength were well-preserved in the upper extremities, spine curvature was normal, and there was no evidence of muscle weakness or atrophy. *Id*. Dr. Swedberg opined that plaintiff had chronic neck pain and a diminished range of motion of the cervical spine, but there was no evidence of cervical radiculopathy and the rest of the results were entirely normal with no evidence of spasm or atrophy. (Tr. 362). Based on his findings, Dr. Swedberg found plaintiff capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects with no difficulty reaching, grasping, and handling heavy objects. *Id*.

On May 30, 2009, plaintiff returned to Mercy Hospital for complaints of abdominal pain, nausea and vomiting. (Tr. 456). Plaintiff reported that he had severe anxiety and depression, and noted that recent stressors caused his current nausea and vomiting; further, plaintiff reported that he smoked marijuana on a daily basis. (Tr. 458, 460). The physical exam notes indicate that plaintiff's mood and affect were normal. (Tr. 465). Plaintiff was admitted overnight and given calcium carbonate and Valium and advised to follow up with his primary care physician and a

14

gastroenterologist. (Tr. 456). On June 2, 2009, plaintiff underwent an EGD with biopsy which appeared normal with the exception of mild antral and body erythema; plaintiff also tested positive for Hepatitis C. (Tr. 469, 478).

Plaintiff was again treated at Mercy Hospital on July 18, 2009, for nausea and vomiting complaints and excessive sweating. (Tr. 486). The admitting records indicate that plaintiff was experiencing intense pain in his chest and significant anxiety and depression, including making the statement that he no longer wanted to live. *Id*. Plaintiff was noted as having a very depressed affect and being slightly agitated. (Tr. 487). Plaintiff was transferred to intensive care for monitoring due to his suicidal ideation and a psychiatric consultation[1] was ordered. (Tr. 488).

## II.    Records related to plaintiff's mental impairments.

At his initial July 11, 2007 visit to Transitional Living, plaintiff underwent a diagnostic assessment and reported intense agitation and thoughts of hurting others. However, he also reported he had one friend with whom he had a good relationship and that he had a girlfriend. (Tr. 417). Plaintiff exhibited an intense distrust of police and reported an extensive history of physical abuse as a child. (Tr. 417-18). Plaintiff reported that he enjoys volunteering at the Mission when it's not too full. (Tr. 418). Plaintiff further stated he used marijuana several times a week, takes Valium twice a day, and had a prior alcohol problem but stopped drinking years ago. (Tr. 420). Plaintiff exhibited functional problems in his eating patterns, pain management, depression, anxiety, traumatic stress, anger and aggression, impulsivity, sleep, and ability to deal

---

[1] There is no documentation of this psychiatric consultation in the record.

15

with stress. (Tr. 421-22). Plaintiff was noted as having a low risk of harm to self due to his reported suicidal ideation, including suicide by police, and having a moderate risk of harm to others due to his expression of homicidal ideation. (Tr. 422-23).

In the concurrent mental status exam, plaintiff was identified as being of average intelligence and moderately well groomed, but exhibiting a mildly mistrustful demeanor and mild agitation. Further, plaintiff was noted to have mild persecutory and nihilistic delusions, and moderate suicidal ideation and aggressiveness with intent and plan. Plaintiff's mood was reported to be severely anxious, moderately depressed and angry, and mildly irritable, with a mildly labile affect. Plaintiff's behavior was noted as being severely withdrawn, moderately aggressive with a moderate lost of interest, moderately cooperative, and mildly agitated and restless. (Tr. 425).

At a July 25, 2007 evaluation, plaintiff reported taking Temazepam for sleep due to frequent nightmares and reported an ongoing struggle with his tendency to be aggressive and violent. (Tr. 397). Plaintiff appeared well groomed, had average demeanor and eye contact, clear speech, and a logical thought process, but reported moderate homicidal aggressiveness. (Tr. 398). Plaintiff was noted to be cooperative, with full affect and average intelligence, but was also moderately depressed, mildly angry, and irritable. (Tr. 399). Plaintiff was diagnosed with intermittent explosive disorder, polysubstance disorder, and antisocial personality disorder

16

and was assigned a GAF[2] of 35. *Id.* Plaintiff was advised to cease taking Temazepam and was started on Seroquel. (Tr. 400).

Notes from an August 7, 2007 follow-up visit indicate that plaintiff electively stopped taking his prescription for Seroquel due to negative side effects and that he emphasized how helpful Valium and Xanax had been for him when he purchased it off the street. (Tr. 409). The prescription for Seroquel was discontinued and Depakote was prescribed instead. (Tr. 410).

September 2007 progress notes indicate that plaintiff reported feeling calmer after taking Depakote, but he was still having difficulty sleeping and used marijuana and Valium when he had breakthrough agitation. (Tr. 407). Plaintiff's demeanor was notably more relaxed than during prior visits, including evidencing a broader and brighter affect. (*Id.*). Plaintiff's dosage for Depakote was increased, noting benefits to date. (Tr. 408).

On September 27, 2007, plaintiff saw E. Brengle, Ph.D., for an interim diagnostic assessment. (Tr. 557-59). Dr. Brengle noted that plaintiff became more agitated and angry during their consultation, expressing rage whenever he is around others, extreme mistrust of others, and fantasies of hurting others. (Tr. 557). Plaintiff implied that he had murdered a man in Florida who had raped a child, but Dr. Brengle noted that he did not believe this was a true story due to the lack of details provided. *Id.* Plaintiff also reported several instances of assaulting people physically and loss of control when he is angered but maintained that the

---

[2] "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 F. App'x. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

people he hurt deserved it.  *Id.*  Plaintiff further stated that he wished to die but would not kill

himself because it was a sin, and discussed his fantasy of provoking a police officer to kill him.

*Id.*  Plaintiff reported that he can hear music from heaven when he is alone.  *Id.*  At the end of the

consultation, plaintiff stated he was so agitated he needed a Valium but that, since no one would

give him any, he would have to smoke marijuana.  *Id.*

      Dr. Brengle noted that the presence of violent fantasies in combination with plaintiff's

limited reality raised concerns that he may act out someday.  (Tr. 557).  Further, Dr. Brengle

stated that, given his reports of hearing heavenly music, plaintiff may have an underlying

psychotic process.  *Id.*  Dr. Brengle also noted that plaintiff's depression with angry agitation had

manic characteristics.  *Id.*  Dr. Brengle diagnosed plaintiff with a psychotic disorder, mood

disorder, post-traumatic stress disorder, cannabis abuse, and antisocial personality disorder,

assigned him a GAF of 20, and recommended further psychiatric evaluations on at least a weekly

basis to assess whether plaintiff would act on his violent fantasies.  (Tr. 558).

      On his Mental Status Exam report, Dr. Brengle noted plaintiff was moderately agitated

and suicidal, with mild intent and plan; was moderately aggressive; had mild auditory

hallucinations; possessed mildly tangential and racing logic; was severely angry; was moderately

depressed and irritable; and was mildly anxious, with full affect.  Dr. Brengle observed plaintiff

to be of average intelligence.  He noted that plaintiff's judgment was impaired because of his

belief that his violence was justified.  In the findings section, Dr. Brengle noted that plaintiff was

preoccupied with violent fantasies and aggressive feelings, specifically noting the stories of

assault and inference to committing a murder.  (Tr. 560).

At plaintiff's October 2, 2007 follow-up visit at Transitional Living, he reported no difference since his Depakote had been increased, but acknowledged that he occasionally missed a dose, and reported ongoing nightmares. (Tr. 405). Plaintiff was advised to take medications as prescribed and given a prescription for Symbyax to improve the benefits of the Depakote. (Tr. 406).

On October 3, 2007, plaintiff underwent a psychological evaluation with Steve Sparks, Ph.D., at the request of the Social Security Administration. (Tr. 368-74). Plaintiff reported that his disability was physical in nature, stating that he had bone spurs in his back, nerve damage, and knee problems. (Tr. 368). Plaintiff reported physical abuse as a child and stated he was enrolled in special education classes while in school. (Tr. 368-69). Plaintiff stated he was unable to work because of his back and that he does not want to be around people. (Tr. 369). Regarding substance abuse, plaintiff reported that prior to 1997 he was a daily drinker and had used heroin, methamphetamine, and crack cocaine, but presently he limited his drug use to marijuana on a weekly basis. *Id*.

Plaintiff stated he was receiving prescriptions for Symbyax for sleep and Depakote for mood from doctors treating him at a community mental health center. Plaintiff reported multiple psychiatric hospitalizations, as both a juvenile and adult, due to a diagnosis of extreme antisocial personality with violent tendencies. Plaintiff stated he was depressed constantly, had nightmares that caused him anxiety, experienced decreased appetite and infrequent crying spells, and had suicidal ideation but denied a plan. Dr. Sparks noted that plaintiff did not evidence symptoms consistent with mania or psychosis but suspected a characterological disorder based on plaintiff's

reports of not tolerating people well and having anger outbursts, including instances of assaultive behavior. (Tr. 370).

Plaintiff reported that he typically stays at home and watches television or goes to the park, and takes care of several lawns. (Tr. 371). Plaintiff reported that he is able to cook, do laundry, manage money, and manage his medications without assistance. He listed listening to classical music and going to the park to get away from people as leisure activities. *Id.* Dr. Sparks administered a Mini-Mental Status Examination (MMSE) and found plaintiff did not show severe deficits in cognitive functioning, but that plaintiff's symptoms suggested moderate levels of tension, hostility, and depressed mood. *Id.* Plaintiff's speech was slow and somewhat rambling with latencies prior to speaking, but he nevertheless exhibited a simplistic but logical, coherent and goal directed thought process. (Tr. 372). There was no evidence of grandiosity, paranoia, religiosity, hallucinations, or delusional thinking. Plaintiff's mood was somewhat depressed, at times irritable and hostile, and overall subdued and pleasant. *Id.* Dr. Sparks noted that plaintiff did not demonstrate behaviors consistent with anxiety, such as fear, nervousness, panic, trembling, tentativeness, or nervous laughter. *Id.* Plaintiff's attention and memory were fair and his cognitive and adaptive functioning were significantly sub-average. *Id.* Dr. Sparks opined that plaintiff was capable of living independently and possessed adequate decision-making abilities. *Id.*

Plaintiff was diagnosed with dysthymic disorder, anxiety disorder, alcohol dependence in sustained full remission, polysubstance dependence in sustained partial remission, and chronic pain, and was assigned a GAF of 45. (Tr. 373). With regard to plaintiff's work-related mental

20

abilities, Dr. Sparks opined that plaintiff's ability to relate to others was markedly to extremely impaired; his ability to understand, remember and follow instructions were moderately impaired; his ability to maintain attention to perform simple, repetitive tasks was markedly impaired; and his ability to withstand stress and pressures associated with daily work was markedly to extremely impaired. (Tr. 374).

October 24, 2007 progress notes from Transitional Living indicate that plaintiff was feeling groggy due to the Symbyax and Depakote prescriptions, but he reported he was doing well and had not had any overt outbursts. (Tr. 403). Plaintiff's Symbyax dosage was lowered and his Depakote was continued. (Tr. 404). Plaintiff was further instructed that he could request Valium from another doctor provided that he reported his medications. *Id.*

In November 2007, non-examining agency psychologist, Catherine Flynn, Psy.D., completed a mental RFC assessment based on Dr. Sparks' evaluation. Dr. Flynn opined that plaintiff had no marked limitations in his mental abilities, finding only moderate limitations in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, and work in coordination with or proximity to others without being distracted by them. (Tr. 377). Dr. Flynn further determined that plaintiff was moderately limited in his abilities to accept instructions and respond appropriately to criticism, to get along with coworkers or peers without distracting them, and to respond appropriately to changes in the work setting. (Tr. 378). Plaintiff was determined to have a marked limitation in his ability to interact appropriately with the general public. *Id.* Dr. Flynn opined that plaintiff was able to process moderately complex interactions, exercise fairly

21

good judgment, and adapt to change, noting that he has survived the homeless lifestyle. (Tr. 379). She also noted that plaintiff had adequate concentration and attention for routine tasks, and would do best with activities that minimize social exposure. *Id.* Dr. Flynn diagnosed plaintiff with dysthymia, an anxiety disorder, a personality disorder with antisocial features, and a substance abuse disorder. (Tr. 381-89). Dr. Flynn provided the following RFC assessment: plaintiff has mild limitations in activities of daily living; moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 391).

December 2007 progress notes from Transitional Living indicate that plaintiff was not doing well on Depakote, was not taking Symbyax as prescribed, and was buying Valium on the street. Plaintiff was noted to be somewhat paranoid, with a neutral to hostile mood and somewhat constricted affect. He was also reportedly unwilling to take medications which would interfere with his ability to hear music from heaven. Valium was prescribed for anxiety. (Tr. 401).

February 2008 progress notes include plaintiff's report that he was doing better, that the Valium was helping his anxiety, but that another dose might be beneficial as he continued to experience nightmares. (Tr. 555). His prescription for Valium was increased, he was advised to continue his Depakote, and he was started on Zolpidem for sleep. (Tr. 556).

April 2008 progress notes show that plaintiff was having difficulty sleeping but otherwise doing well. (Tr. 553). Plaintiff was advised to continue with his Valium and Depakote, but was also given a prescription for mirtazapine. (Tr. 554).

22

In June 2008, plaintiff's progress notes indicate that he was doing reasonably well. However, plaintiff reported he had not taken the Depakote for six to seven weeks because it was not helping, but the Valium was aiding his anxiety. (Tr. 551). Plaintiff's prescription for Depakote was discontinued and he was told to continue with his anti-depressant and Valium prescriptions. (Tr. 552).

At a September 2008 follow-up, plaintiff reported that he was doing reasonably well and was calmer on Valium, but reported difficulty sleeping. (Tr. 549). To address his sleeping problems, plaintiff was started on Elavil and directed to continue on Valium and anti-depressants. (Tr. 550).

Progress notes from November 2008 demonstrate that plaintiff experienced ongoing anxiety and panic, and, at his baseline, felt nervous and anxious. (Tr. 547). Plaintiff reported sleeping and eating well and he was advised to continue taking his medications as prescribed. (Tr. 547-48). December 2008 progress notes indicate that plaintiff was having difficulty with anxiety and mood swings, but no mania or psychosis was reported. (Tr. 545). Plaintiff said he was sleeping four to six hours nightly and had a poor appetite. *Id.* Plaintiff was noted as appearing nervous and irritable. *Id.* To aid with his irritability, plaintiff was prescribed Trileptal and advised to continue with his other medications. (Tr. 546).

Notes from a March 23, 2009 follow-up indicate that plaintiff was suffering with anxiety and mood swings and was prescribed Trileptal. (Tr. 542).

23

June 2009 progress notes indicate that plaintiff was bright, calm, and cooperative; slept well and had a fair appetite; experienced no side effects from his medication; reported no psychosis or mania; and was excited about his new dog. (Tr. 537).

Notes from another follow up visit, apparently dated August 17, 2009, indicate that plaintiff reported to be in a stable condition with no psychosis or mania and was sleeping well with a fair appetite. (Tr. 535).

In December 2009, a Medical Assessment was completed by Dr. Dahar from Transitional Living. (Tr. 567-70). Dr. Dahar opined that plaintiff had a fair ability to function independently; poor abilities in following work rules and maintaining attention/concentration; and no ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, or deal with work stresses, citing plaintiff's agitation, socially inappropriate behavior, and violent speech. (Tr. 568). Further, Dr. Dahar found that plaintiff had a poor ability to understand, remember and carry out complex job instructions; a poor ability to understand, remember, and carry out detailed but not complex job instructions; and no ability to understand, remember, and carry out simple job instructions. Dr. Dahar noted that plaintiff had struggled with making adjustments throughout his treatment and exhibited difficulty maintaining stability when his insurance provider changed causing a change in how he accessed services. (Tr. 569). Regarding personal adjustments, Dr. Dahar opined that plaintiff had a fair ability to maintain personal appearance, poor ability to demonstrate reliability, and no ability to relate predictably in social situations or behave in an emotionally stable manner as plaintiff frequently made statements regarding hurting others. *Id*.

24

## PLAINTIFF'S TESTIMONY AT THE HEARING

At the hearing, plaintiff testified that he currently lives with and is financially supported by his mother, whom he helps by cleaning the house. (Tr. 34). Plaintiff testified that he had a previous history with substance abuse but had not used street drugs since 1997, but then clarified that he occasionally uses marijuana, at most several times a month. (Tr. 35). Plaintiff stated that he did not currently abuse prescription medication, but that prior to 1997 he "pretty much did everything there was." *Id*. Plaintiff testified that he gets money for marijuana, or marijuana itself, from friends to calm himself down and stated that he has been honest with his medical providers about his marijuana use. (Tr. 36).

The ALJ questioned plaintiff about several medical records from 2009 that noted plaintiff used marijuana on a daily basis and plaintiff testified that, at that time, he may have used marijuana daily. (Tr. 46-47). The ALJ also asked about records that noted plaintiff purchased Valium and Xanax on the street; however, plaintiff denied buying these drugs on the street and explained that he told his psychiatrist he *could* buy these drugs illegally, but denied doing so. (Tr. 47). Plaintiff testified that he was compliant with his medications and took them as directed, except that he was unable to take Seroquel as prescribed because he was could not function on it until they lowered the dosage. (Tr. 48-50). The ALJ questioned plaintiff about medical records that noted he was refusing to take medication because it interfered with is ability to hear music from heaven, but the plaintiff maintained that he simply enjoyed the music but took his medication as prescribed. (Tr. 50-1). Plaintiff testified that the medication has helped him calm down but that he was not benefitting from therapy. (Tr. 54)

25

Plaintiff testified that he was previously employed as a cook, lawn mower operator, laborer and fork lift operator, maintenance worker, and dishwasher and that he had not been employed since July 2005. (Tr. 37-39). Plaintiff stated that he had not held a job for a significant period of time because he would get angry and/or paranoid, get into fights and choose to move on to a new job or new location. (Tr. 40-41). Further, plaintiff testified that he did not do any volunteer work except for once when he was told he had to. (Tr. 39, 58).

Plaintiff stated that he did not like to be around people and, when at home, he did not see people regularly and spent most of his time alone in his room. (Tr. 41). Plaintiff testified that he had suicidal thoughts and both general and specific homicidal thoughts. (Tr. 42). Plaintiff further testified that he slept little, approximately three to four hours nightly, due to nightmares. (Tr. 42-43). Plaintiff stated that he also had flashbacks during the day to disturbing incidents in his past several times a week and that he retreats to a utility shed in the back to escape from people. (Tr. 43). Plaintiff testified that he only leaves the house two to three times a week as needed to run basic errands. (Tr. 44). Plaintiff reported that he rarely does grocery shopping and does not engage in social activities. *Id*.

Plaintiff testified that he often hears music when none is playing and stated that he thinks it comes from either heaven or hell. (Tr. 44-45). Plaintiff reported having constant paranoid thoughts regarding his family, the government, and the police. (Tr. 45-46). He reported that he often listens to music and watches television, rarely cooks, and does laundry. (Tr. 57). Plaintiff testified that he spent two years in prison for burglary when he was 18 but that his brother actually did the crime and blamed him. (Tr. 58). Plaintiff further testified that he had been in

26

treatment for substance abuse prior to 1997, but did not attend any substance abuse treatment currently. (Tr. 59).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE testified that plaintiff's past relevant work as a lawn mower was medium and semiskilled, his work as a forklift operator was light and semiskilled, and his work in maintenance was medium and unskilled. (Tr. 60-61). The ALJ asked the VE to assume an individual of plaintiff's age, education, and work experience who can perform a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects, with no difficulty reaching, grasping, and handling; who has no physical limitations; who can process moderately complex interactions, has adequate concentration and attention for routine tasks, can adapt to changes, exercise fairly good judgment, and does not decompensate under stress; and who has superficial minimal contact with co-workers and no public contact. (Tr. 61-62). The VE testified that such an individual could do plaintiff's past work as lawn mower, forklift operator, and maintenance worker, but not his work as dishwasher due to exposure to co-workers. (Tr. 62).

The ALJ then asked the VE to assume such an individual who was also limited to work where there was no strict production quotas. *Id*. The VE testified that such an individual could do plaintiff's past relevant work as a forklift operator at the light level and also could perform jobs such as motel cleaner or night cleaner, and laundry aide. (Tr. 62-63). The ALJ asked the VE to further consider such an individual who had extreme limitations in his ability to relate to others, marked limitations in his ability to do simple work, and marked limitations in terms of

27

dealing with work stressors. (Tr. 63). The VE testified that such an individual would be precluded from working. *Id.* The ALJ further asked the VE to assume an individual who can stand and walk for four hours, without interruption two to three hours; has no restrictions sitting; can lift and carry up to 20 pounds; has moderate limits in pushing, pulling and bending; can process moderately complex interactions; has adequate concentration and attention for routine tasks; can adapt to changes, exercise fairly good judgment, and does not decompensate under stress; and who has superficial minimal contact with co-workers and no public contact. *Id.* The VE testified that such an individual would be able to do plaintiff's past work as forklift operator. (Tr. 64). The ALJ then asked the VE to assume such an individual who had extreme limitations in his ability to relate to others, marked limitations in his ability to do simple work, and marked limitations in terms of dealing with work stressors. *Id.* The VE testified that, again, such an individual would be precluded from working. *Id.* The ALJ lastly asked the VE to consider an individual with the limitations plaintiff testified to and the VE testified that, based on the need to seclude himself and extreme difficulties in tolerating everyday stressors, such an individual would be precluded from working. (Tr. 65).

## OPINION

Plaintiff assigns three errors in this case: (1) the ALJ erred in determining that plaintiff did not meet a Listing for mental health impairments; (2) the ALJ erred in rejecting the opinion of plaintiff's treating psychiatrist; and (3) the ALJ erred in finding no severe physical impairment and providing no physical limitations in the adopted residual functional capacity. For the following reasons, the Court finds the instant matter should be affirmed.

28

**I.     The ALJ's determination that plaintiff did not meet a mental Listing is supported by substantial evidence.**

The ALJ determined plaintiff's severe mental impairments, considered singly and in combination, did not meet or equal the "paragraph B" criteria of Listings 12.03, 12.04, 12.06, or 12.08.[3]  Plaintiff contends the ALJ's failure to determine that he met the paragraph B criteria was erroneous on the following grounds: (1) the ALJ improperly characterized evidence related to plaintiff's daily activities and social functioning, specifically his volunteer work; (2) the ALJ erroneously stated that her finding was supported by Dr. Sparks evaluation; and (3) the ALJ failed to accord significant weight to plaintiff's GAF scores.  Plaintiff's arguments are not well-taken.

The ALJ concluded plaintiff had mild restrictions in activities of daily living, citing evidence that plaintiff had no problems with personal grooming, and that he did yard work and laundry, can cook, and drives as documented in Dr. Sparks evaluation.  (Tr. 18) (citing Tr. 368-75).  Regarding social functioning, the ALJ found plaintiff moderately limited as he reported having a friend and girlfriend, *Id.* (citing Tr. 417), and volunteered without major incident.  The ALJ determined that plaintiff was moderately limited in his ability to maintain concentration, persistence or pace and had no episodes of decompensation.  The ALJ noted this determination

---

[3] To meet the paragraph B criteria for Listings 12.03, 12.04, 12.06, and 12.08, two of the following must be present:

  1.  Marked restriction of daily activities; or
  2.  Marked difficulties in maintaining social functioning, or;
  3.  Marked difficulties in maintaining concentration, persistence, or pace; or
  4.  Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.03(B), 12.04(B), 12.06(B), and 12.08(B).

was supported by the medical opinions of Dr. Sparks and Dr. Flynn, neither of whom found that plaintiff's severe mental impairments met or equaled a Listing. (Tr. 18).

With respect to plaintiff's daily activities, plaintiff contends the ALJ failed to consider "the multitude of ways [he] is restricted in his daily activities and the numerous mental health symptoms, documented throughout the record, affecting him o[n] a daily basis." (Doc. 10, p. 3). However, plaintiff fails to cite any record evidence in support of this argument or to explain the "multitude of ways" he is limited in his daily activities. Without any such support, plaintiff fails to meet his burden on this alleged error.

With regard to plaintiff's social functioning, the ALJ noted evidence from the Transitional Living records that "although the [plaintiff] alleges difficulty with being around groups of people, he has a friend, with whom he stays in contact, and had a 'girlfriend of sorts.' He also volunteered at a local Mission without major incident." (Tr. 18). Plaintiff contends the ALJ mischaracterized the facts and that the work done at the Mission was not voluntary as plaintiff was required to do volunteer work in order to receive state welfare benefits. Further, plaintiff argues that the work was not without incident, as the ALJ stated, and that he was quickly exempted after the volunteer supervisor observed his difficulties in dealing with others. Plaintiff asserts that his testimony at the ALJ hearing supports his version of events and a finding that plaintiff is markedly impaired in his social functioning. The Court disagrees.

At the hearing, the ALJ asked plaintiff if he did any volunteer work and the plaintiff replied, "No." (Tr. 39). Plaintiff testified that he was sent to the Mission to "work" as a condition of receiving assistance from the Department of Jobs and Family Services and was

referred to Transitional Living by a person at the Mission. (Tr. 52-53). Following up, the ALJ

asked if plaintiff currently volunteered at the Mission or if it was a one-time occurrence and the

plaintiff replied it "was just because I was told I had to go down there and do it." (Tr. 58).

There is nothing the ALJ could have gleaned from this exchange to infer that plaintiff had major

problems when he was volunteering or that he was exempted from volunteering because he

exhibited significant problems dealing with people. Moreover, plaintiff has not identified any

supporting evidence in the record; rather, the record contradicts plaintiff's assertions. *See* Tr.

418 (plaintiff reported volunteering at the Mission and stated he "enjoys it when it's not too

full."). Accordingly, the ALJ did not mischaracterize the evidence pertaining to plaintiff's

volunteering and her findings in this regard are supported by substantial evidence.

Plaintiff's second argument is that the ALJ's Listings finding is not supported by Dr.

Sparks' evaluation and report. In determining that plaintiff failed to meet the paragraph B

criteria with regard to his mental impairments, the ALJ cited the opinions of non-examining

agency psychologist Dr. Flynn and consultative examining psychologist Dr. Sparks, "both of

whom did not find a mental listing either met or equaled, singly or in combination." (Tr. 18).

Plaintiff asserts that the ALJ erred because Dr. Sparks opined that plaintiff's ability to relate to

others was markedly to extremely impaired, his ability to maintain attention to perform simple,

repetitive tasks was markedly impaired, and his ability to withstand the stress of daily work was

markedly to extremely impaired, thus satisfying the paragraph B criteria and supporting a finding

of disability. *See* 20 C.F.R. Part 404, Subpart P., Appendix 1. §§ 12.03(B), 12.04(B), 12.06(B),

and 12.08(B).

31

Though Dr. Sparks opined that plaintiff met the paragraph B criteria, the ALJ gave "little weight" to this opinion on plaintiff's functioning.  The ALJ adopted Dr. Flynn's opinion and determined that "Dr. Sparks' opinions regarding functioning are inconsistent with findings in the body of his report and other evidence in the file."  (Tr. 23, citing Tr. 368-74).  Dr. Sparks' opinion on plaintiff's functioning was inconsistent with his observations that plaintiff was cooperative, exhibited appropriate affect, showed no overt signs of mania or lability, had fair reasoning, attention and memory, and had adequate decision-making abilities.  *Id.*  Dr. Sparks assigned plaintiff a GAF of 41 to 50 from a "symptom-related standpoint," but found that plaintiff appeared to experience only some difficulty due to psychological symptoms and assigned him a GAF of 61 to 70 from a "functional standpoint," indicating only some mild symptoms.  (Tr. 373).  *See* DSM-IV at 32.  The ALJ also noted that Dr. Sparks' finding that plaintiff had a polysubstance dependence, in sustained partial remission, was inconsistent with multiple references in the record to plaintiff using marijuana and buying Valium off the street.  (Tr. 23).  The ALJ correctly noted that Dr. Sparks did not opine that plaintiff met or equaled a Listing, and chose to rely on the observations contained within the body of Dr. Sparks' report that were consistent with other evidence of record.

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility.  *Felisky*, 35 F.3d at 1036 (6th Cir. 1994); *Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently.

32

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d

342, 347 (6th Cir. 1993); *Tyra v. Sec'y of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The

Commissioner must state not only the evidence considered which supports the conclusion but

must also give some indication of the evidence rejected in order to facilitate meaningful judicial

review. *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v.*

*Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

Here, the ALJ provided specific reasons, supported by the evidence of record, for

adopting only portions of Dr. Sparks' report due to both internal and external inconsistencies.

The ALJ clearly articulated which evidence was rejected and why, and identified supporting

evidence for her findings. Consequently, the ALJ's determination to afford "little weight" to Dr.

Sparks' findings is supported by substantial evidence.

Plaintiff's final argument is that the ALJ should have given greater weight to his low

GAF scores in assessing whether plaintiff met the Listings. At a July 25, 2007 evaluation at

Transitional Living, plaintiff was assigned a GAF score of 35. (Tr. 399). On September 27,

2007, pursuant to an interim diagnostic assessment at Transitional Living, Dr. Brengle assigned

plaintiff a GAF of 20. (Tr. 558). Lastly, Dr. Sparks assigned plaintiff a GAF of 45. (Tr. 373).

As the Sixth Circuit instructs:

A GAF score is a subjective determination which represents "the clinician's
judgment of the individual's overall level of functioning." American Psychiatric
Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM- IV), (4th
ed. 1994), p. 30. The GAF score is taken from the GAF scale which "is to be rated
with respect only to psychological, social, and occupational functioning." *Id.* The
GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of

33

severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death).

*Rutter v. Comm'r of Soc. Sec.,* No. 95-1581, 1996 WL 397424, at *1 (6th Cir. July 15, 1996). The DSM-IV categorizes individuals with scores of 11 to 20 as being in some danger of hurting themselves or others or occasionally failing to maintain personal hygiene or exhibiting gross impairment in communication. Individuals with scores of 21 to 30 exhibit behavior that is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment. Individuals with scores of 31 to 40 have some impairment with reality testing or communication. Individuals with scores of 41 to 50 are identified as having "serious" symptoms. *See* DSM-IV at 32.

Here, plaintiff received three GAF scores ranging from 20 to 45 in a short period of time, from July to October 2007. These are undeniably low scores indicating, at best, that plaintiff had serious symptoms. However, even a low GAF score is not determinative in finding that an individual is disabled. *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006). Further, the Sixth Circuit has repeatedly stated that GAF scores are not medical data; rather they are subjective determinations, and ALJs are not required to rely on them in making disability determinations. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). *See also Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Kornecky v. Comm'r of Soc. Sec.*, No 04-2171, 2006 WL 305648, at *13-14 (6th Cir. Feb. 9, 2006); *Wesley v. Comm'r of Soc. Sec.*, No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000).

Here, the ALJ acknowledged and discounted each GAF score in turn.  The ALJ determined the July 2007 GAF score of 35 was inconsistent with the treating providers' notes that plaintiff was well-groomed; had average demeanor, eye contact, and activity; showed no major problems with thought content, hallucinations, or thought processes; exhibited only moderate depression, mild anger, and only mild irritability; had full affect; and was cooperative with no reported impairment of cognition.  (Tr. 20, citing Tr. 397-400).  The ALJ discounted the September 2007 score of 20, a low score indicating a very severe impairment in functioning and danger of hurting self or others, citing the inconsistent concurrent observations that plaintiff was well-groomed, had an average demeanor, was only moderately agitated and depressed, was mildly anxious and irritable, exhibited no major problems with thought content, perception, thought process, affect, or behavior, and was not reported to have impaired cognition.  *Id*.  (citing Tr. 557-61).  Finally, the ALJ discounted Dr. Sparks' GAF assigned score of 45 based on the inconsistent observations contained in his report as discussed above.  *Id*.  (citing Tr. 368-74)

Contrary to plaintiff's assertion, the ALJ did not summarily dismiss these scores; rather, she considered each score and provided substantial support for her determination that they were inconsistent with the concurrent observations regarding plaintiff's demeanor and functionality.  It is well within the discretion of the ALJ to discount these scores, as it was a factual determination made by the ALJ after she weighed the evidence of record.  *See Davis v. Chater*, No. 95-2235, 1996 WL 732298, at *2 (6th Cir. Dec. 19, 1996) (upholding ALJ's determination to discount GAF score of 35).  Further, the lack of a recent low GAF score is notable in light of the progress notes from Transitional Living that plaintiff has been doing well for some time and is benefitting

from his treatment and medication.  *See Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358 (6th Cir. 2001).

In light of the above, the ALJ's determination that plaintiff's severe mental impairments did not meet or equal a Listing is supported by substantial evidence and should be affirmed.

**II.      The ALJ's decision to afford "little weight" to Dr. Dahar's opinion is supported by substantial evidence.**

The record includes progress notes from plaintiff's treatment at Transitional Living from July 2007 to August 2009 (Tr. 397-428; 535-61) and a 2009 mental assessment from his treating psychiatrist (Tr. 567-70).  The progress notes, outlined above, include findings that, at the beginning of his treatment, plaintiff was evidencing psychotic processes and characteristics resembling mania.  (Tr. 558).  However, a review of the two years of progress notes from Transitional Living demonstrates that plaintiff has responded well to treatment and medication and, aside from occasional increases in anxiety, is doing reasonably well.  Despite this progress, Dr. Dahar completed a mental assessment in September 2009[4] opining that plaintiff had little to no ability to perform the requisite activities inherent in full time employment.

The ALJ gave "little weight" to Dr. Dahar's opinion due to inconsistencies between his assessment, treatment notes that plaintiff was doing well and sleeping well, and plaintiff's reported daily activities.  The ALJ also noted that Dr. Dahar's assessment was silent with regard

---

[4] The record includes two versions of the "Medical Assessment of Ability to do Work Related Activities," the first (Assessment 1, Tr. 562-65) and the second (Assessment 2, Tr. 567-70) are nearly identical, aside from one distinction.  Assessment 1 was signed by Elliot Linch on September 21, 2009.  Assessment 2 is the same in every aspect, including the signature and date from Assessment 1, but further includes an illegible signature (Peter A.) from a psychiatrist dated December 7, 2009.  It is unclear from the record the extent of Dr. Dahar's involvement with either Assessment, but for the purposes of this Report and Recommendation, the Court will adopt the position of the ALJ and parties that they contain Dr. Dahar's medical opinions.

to plaintiff's ongoing marijuana use and medication non-compliance, despite his treatment notes that plaintiff does well when he complies with his medication and treatment. (Tr. 23).

Plaintiff contends that Dr. Dahar's opinion should have been given controlling weight as he was his treating psychiatrist for over two years and his opinion is supported by Dr. Sparks' consultative examination. Further, plaintiff asserts the ALJ erroneously discounted Dr. Dahar's opinion by failing to address references to plaintiff's psychotic symptoms in the Transitional Living treatment notes. Lastly, plaintiff contends the ALJ erred in weighing Dr. Dahar's opinion in light of the requirements of 20 C.F.R. § 404.1527(d). Plaintiff's arguments are not well-taken.

The ALJ's decision to afford "little weight" to Dr. Dahar's opinion is supported by substantial evidence. The ALJ's reasonably determined that Dr. Dahar's assessment was inconsistent with his progress notes. From February 2008 to August 2009, the Transitional Living progress notes indicate that plaintiff was doing well, responding positively to medication, and was evidencing no mania or psychosis. (Tr. 535-55). Specifically, the last progress note in the record, dated August 17, 2009, shows that plaintiff was in a stable condition, was participating in daily activities, and was sleeping well and had a fair appetite. (Tr. 535-36). Further, plaintiff did not report any mania or psychosis, denied any suicidal or homicidal plans, and reported that he was taking his medications with no side effects. *Id*. Despite these positive findings, Dr. Dahar opined that plaintiff had no ability to behave in an emotionally stable manner or relate predictably in social situations. (Tr. 568-70). Dr. Dahar did not address plaintiff's recorded improvements in his assessment and provided no explanation for the disparity between plaintiff's noted progress and the highly negative assessment. The ALJ noted this conflict in the

37

medical evidence and reasonably determined that Dr. Dahar's opinion was inconsistent with the progress notes. Substantial evidence in the record supports the ALJ's determination to afford "little weight" to Dr. Dahar's opinion on the ground of inconsistency, regardless of how plaintiff or the Court would have resolved the conflict. *See Kinsella*, 708 F.2d at 1059.

The ALJ also noted that she afforded "little weight" to Dr. Dahar's opinion as it was silent with regard to plaintiff's recorded marijuana abuse and medication non-compliance. (Tr. 23). Notes from Transitional Living document plaintiff's history of drug abuse and ongoing abuse of marijuana (Tr. 420, 557) and several instances of his failure to take his medication as prescribed. (Tr. 401, 405, 409, 551). Dr. Dahar did not discuss these factors in his assessment, despite multiple records indicating that plaintiff's condition improved when he was compliant with medication. (Tr. 403, 408, 547-48). Again, the ALJ noted an inconsistency between Dr. Dahar's treatment notes and his assessment and reasonably determined that his opinion was deserving of "little weight."

Lastly, the ALJ noted the discrepancies between Dr. Dahar's opinion that plaintiff has no ability to relate predictably in social situations or behave in an emotionally stable manner with plaintiff's reported daily activities, *i.e.*, interacting with friends to purchase drugs and moving to Ohio to help his mother. Dr. Dahar's only supporting evidence for his opinion was a brief note that plaintiff "was in a 'risk plan' due to his violent speech. He frequently made statements about hurting people in the community and his family members." (Tr. 569). However, the Transitional Living treatment notes indicate that plaintiff was doing well and was calmer on Valium (Tr. 549); was not exhibiting mania or psychosis (Tr. 535, 537, 545); was bright, calm,

38

and cooperative, and excited about his new dog (Tr. 537); and was in a stable condition. (Tr. 535). In light of the lack of evidence supporting Dr. Dahar's assessment and the existence of substantial conflicting evidence, the ALJ was not required to afford greater weight to Dr. Dahar's opinion solely on the basis of his treatment relationship to plaintiff. *See Young*, 925 F.2d at 151.

Further belying plaintiff's assertion that the ALJ should have afforded controlling weight to Dr. Dahar's opinion due to their two and a half year treating relationship is plaintiff's hearing testimony that he had seen Dr. Dahar at most six times. He described their treating relationship as follows:

> Dr. Dahar never asked me what I could or couldn't do. Dr. Dahar basically said there -- the problem I have with Dr. Dahar and I've said this before down there try - - you know, at their place, he'd sit there, you'd come in, how you doing today? You doing okay? Fine, here's your prescription, leave. I mean, I've had six psychiatrists down there since I've been there, I think it is, and I haven't met one of them that's spent more than 15 minutes talking to me yet.

(Tr. 52). Moreover, the record does not indicate that Dr. Dahar was actively involved with plaintiff's frequent evaluations at Transitional Living. *See, e.g.*, (Tr. 397-400, July 2007 evaluation completed by Dr. David, Heather Lawrence, and Julie Grohal); (Tr. 409-10, August 2007 progress notes completed by Dr. David and Brenda Benson); (Tr. 403-08, September and October 2007 progress notes completed by Dr. David and Heather Lawrence); (Tr. 401-02, December 2007 progress note completed by Heather). Though it is not improper for a doctor to rely on progress notes written by colleagues in a group setting, the lack of personal examination of the patient is one factor the ALJ may consider in determining the weight to give that doctor's opinion. After all, the treating physician rule is premised on the notion that a physician who has

39

examined and treated a patient over time is in a better position to assess the severity of and limitations surrounding the patient's impairments. *Barker*, 40 F.3d at 794.

The weight given to a treating physician's opinion takes into account the length and nature of the treatment relationship, its supportability, and its consistency with other evidence in the record. 20 C.F.R. § 404.1527(d)(2)(i)-v(ii), (4). Here, as noted by the ALJ, Dr. Dahar's opinion is inconsistent with evidence of record on several fronts and plaintiff's own testimony evidences the cursory nature of their treatment relationship. Accordingly, the ALJ's determination to afford "little weight" to Dr. Dahar's opinion is substantially supported and should be affirmed.

## III. The ALJ's finding that plaintiff did not have severe physical impairments is supported by substantial evidence.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. *See* 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b).

Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff

must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers v. Comm'r*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

In his last assignment of error, plaintiff contends the ALJ's finding of non-severe carpal tunnel syndrome, right ulnar nerve lesions, and multiple gastrointestinal diagnoses are without substantial support in the record, citing to records showing he was diagnosed with moderately severe carpal tunnel syndrome and ulnar nerve lesions at the wrist and elbow in his right arm pursuant to a January 2005 EMG. Further, plaintiff argues the ALJ failed to meaningfully address his lengthy history of hospital visits pertaining to various gastrointestinal diagnoses and, thus, failed to appropriately accommodate the limitations they placed on plaintiff in determining his RFC.

Plaintiff appears to argue that the he cannot sustain employment because he has been diagnosed with moderately severe carpal tunnel syndrome, ulnar nerve lesions, and multiple gastrointestinal problems. Contrary to plaintiff assertion, a mere diagnosis or catalogue of symptoms does not indicate functional limitations caused by the impairment. *See Young*, 925 F.2d at 151 (diagnosis of impairment does not indicate severity of impairment). As explained

41

below, the ALJ reasonably determined that plaintiff's multiple emergency room visits for gastrointestinal problems and his carpal tunnel diagnosis are not persuasive of a severe impairment as "[t]he record does not demonstrate that these conditions cause more than minimal limitations in the ability to perform basic work activities lasting, or expected to last, twelve months in duration." (Tr. 17).

The ALJ's non-severity finding is supported by substantial evidence. As detailed above, despite plaintiff's numerous emergency room visits, the clinical findings were unremarkable and he was generally released after responding well to fluids and anti-nausea medication. *See* 20 C.F.R. §§ 404.1508 (impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, and not solely by claimant's statement of symptoms); 404.1528(a) (claimant's own description of impairment is not enough to establish existence of that impairment). Likewise, diagnostic tests consistently revealed normal findings. Notably, CT scans of plaintiff's abdomen revealed normal findings (Tr. 282, 284), with the exception of scans demonstrating a minimal nonspecific ileus, but appendicitis was ruled out (Tr. 238-42, 258, 302, 308).[5] Further, EGD results were largely unremarkable, aside from demonstrating mild esophagitis, gastritis, and gastroesophageal reflux. (Tr. 293, 336).

The record demonstrates that plaintiff was treated 14 times, between 2000 and 2009, for gastrointestinal problems, less than twice a year, and was often quickly discharged after treatment. Throughout these visits, plaintiff was diagnosed with multiple gastrointestinal

---

[5] In July 2006, plaintiff refused the CT scan stating that "they always do CAT scans and can never figure out what is wrong. I don't want a CAT scan today." (Tr. 257).

conditions, including: recurrent nausea and vomiting, gastroesophageal reflux disease, esophagitis, hiatal hernia, chronic gastritis, status-post cholecystectomy, history of chronic cholecysystitis, history of cholelithiasis, and history of peptic ulcer disease.  Notably, there is no medical evidence or opinion in the record which indicates these conditions limited plaintiff's abilities in any way.

The record further includes diagnoses of carpal tunnel syndrome, right ulnar nerve lesions, and neck pain, including a January 2005 finding that plaintiff's carpal tunnel syndrome was moderately severe.  (Tr. 318).  Again, there is no medical evidence or opinion that these conditions limited plaintiff.  Notably, plaintiff relies on test results that pre-date his alleged onset of disability by some six months. (Tr. 318, January 18, 2005 EMG).  However, plaintiff continued to work for half a year after being diagnosed with moderately severe carpal tunnel syndrome.  *See* Tr. 140, 153, 159.  "If [a claimant] is able to engage in substantial gainful activity, [the Commissioner] will find that person not disabled."  20 C.F.R. § 404.1571.  Here, plaintiff earned at least $830 per month (Tr. 140) after his July 2005 diagnosis of moderately severe carpal tunnel syndrome, indicating that he engaged in substantial gainful activity despite his impairment.[6]  Assuming, *arguendo*, the ALJ erred in not finding the carpal tunnel syndrome to be a severe impairment, such error was harmless as plaintiff was able to engage in substantial gainful activity with the impairment.

---

[6] Earnings over $830 per month in 2005 indicate that work activity was substantial gainful activity. *See* 404.1574(b)(2)(ii)(B). *See also* http://www.ssa.gov/OACT/COLA/AWI.html (last visited October 6, 2011).

In finding plaintiff's physical impairments non-severe, the ALJ stated that "the record does not demonstrate that these conditions cause more than minimal limitations in the ability to perform basic work activities lasting, or expected to last, twelve months in duration. Little treatment records for these impairments exist in the record. Further, testimony at the hearing mainly dealt with the claimant's mental problems." (Tr. 17-18). Here, the evidence, consisting of plaintiff's numerous, yet brief, hospital room visits, a diagnosis of carpal tunnel syndrome with no associated limitations, and plaintiff's substantial gainful activity throughout 2005, does not indicate that plaintiff's physical impairments are severe. Accordingly, the ALJ's finding in this regard is substantially supported and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner should be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: _10/7/11_

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge

44

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DARL SHOOK,                                      Case No. 1:10-cv-860

     Plaintiff                                Dlott, J.
                                                 Litkovitz, M.J.
     vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

     Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).